Case number 19-5272, O.A. et al. v. Donald J. Trump as President of the United States et al. Mr. Ruveni for the appellants, Ms. Zaharia for the O.A. appellees, Mr. Wright for the SMSR appellees. Morning, counsel. Mr. Ruveni, please proceed when you're ready. Thank you. Good morning, your honors, and may it please the court, and I'd like to reserve three minutes for rebuttal. Your honors, plaintiffs, organizations, and individual aliens challenge a rule concerning asylum eligibility, a core and fundamental issue that is adjudicated in administrative proceedings and then reviewed in the court of appeals on a petition for review thousands of times a year. The district court, however, ignored the comprehensive, carefully reticulated claim channeling and judicial scheme that Congress put together in 1996 and revised in 2005 and found that because this case involves organizations as well as individuals challenging under the APA a decision on the record, that that cannot be channeled through section 1252 into the courts of appeals. The district court was wrong. Many of the cases from this court, not addressing 1252, but claim channeling specifically, I'll go into detail why, but the government's view of the court fundamentally misapplied the Thunder Basin framework, and even if there is jurisdiction, we think the organizations lack a cause of action, not within the zone of interest, and in any event, the government wins on the merits. So starting with jurisdiction, as we lay out in our briefing, 8 U.S.C. 1252 is a carefully circumscribed specific claim channeling and in some instances claim barring provision of the INA, and in our view, it does two things that are relevant to this case. First, it channels all the individual aliens in this case, it channels their claims into the petition for review process. At the time this case was filed, all but one of the individual plaintiffs was issued a notice to appear, and so that triggered the administrative review process. At the time the court issued its decision, that last individual had also been placed in the removal proceedings, and so that individual's claim was no longer right to proceed in the district court, and as to the organizations, 1252 specifically provides for a cause of action only to individual aliens. It does not provide a cause of action to organizations seeking to allege claims or raise claims on behalf of third-party aliens. So whether or not the organizations may have organizational standing, the claim channeling scheme itself provides a cause of action for the aliens only, and I think starting with two of the fundamental Supreme Court cases on this that we cite in our briefs, specifically Block and Thunder Basin, I think just a quote from Block that the district court didn't address, although that we cited to the district court, this is at pages 352 to 53, 467 U.S., a statute that provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons. If the statute does that, I should say, quote, judicial review of those issues at the behest of other persons may be found to be impliedly precluded, and I think the district court and plaintiffs on appeal rely on the canon that there is a presumption of judicial review of agency action, and unless the statute uses magic words that say this claim by this plaintiff is barred, then the claim may proceed, but I think the lesson of this court's cases and the Supreme Court cases, here I'm referring to Jarchezi and American Federation, both one from 2013 and 2019, on which I think each of your honors was a part of at least one of the cases in the decision, I'll point out that the opposite is true, that unless, there's no magic words that need to be used in a situation like this, and that's because there is a vehicle for individuals to raise claims and vindicate the interests the statute in Congress has asked, has provided for, so the inference here is that the organizations have no claim unless and until there's something in the Congress intended them to have a claim. So can I just ask about the individuals, if we start, just put the organizations aside for a second. With the individuals, given the Supreme Court's recent decision and the Regents of the University of California case, what's the argument that 1252b9, which is the main provision you rely on, I know you have some other ones too, but 1252b9 appears to be the main focal point of the submission, what's the argument in light of the Supreme Court's decision and the Regents case, which also involves some individuals at least, that even though that provision didn't preclude review in that case, it does preclude review here? Yes, your honor. Actually, I think Regents is easily distinguishable and Regents doesn't really advance the ball on this any more than Justice DeLito's plurality in Jennings v. Rodriguez did, which is what the parties argued about in district court and in their first submission before this court, before Regents was issued. But Regents involved a facial challenge to the Secretary's decision to rescind DACA. DACA is a separate benefit that provides work authorization and it's basically non-enforcement against a class of individuals that is issued before any removal proceeding ever occurs. And it's not something that is provided for by statute or regulation that can be litigated in the removal proceeding. So once your DACA is rescinded, that's not something you litigate in the removal proceeding. And I think the key language in Regents, which didn't purport to be an all-encompassing analysis of 1252 because it wasn't the focus of the decision, but it says, quote, the process by which removability will be determined, quote, that's one of the at least three categories of things that are channeled into removal proceedings. And here, while plaintiffs say both individuals and organizations are not challenging final orders of removal, and in a technical sense, that's true, they are challenging the rule of asylum eligibility, that asylum is relief from removal. So they are challenging- But what the Supreme Court said in that case is, and it's certainly the last sentence of the paragraph that discusses B9, and it's certainly not a bar where as here the parties are not challenging any removal proceedings. And here, I don't understand the plaintiffs to be challenging removal proceedings. It's true, I take your point that the challenge can be raised in the context of a removal proceeding. That, I think, is true. If somebody is subject to removal and then they seek asylum, they can, and then they face the ineligibility bar that emanates from the rule, they could raise the challenge there. But they're not challenging removal proceedings as such. They're challenging the ineligibility that comes from the rule combined with the President's action. And so it seems like it fits within that sentence, the argument would be, that B9 doesn't pose a bar because there's not a challenge to removal proceedings, as is evidenced by, for example, somebody who would seek affirmative asylum and wouldn't be part of a removal proceeding, but would still be subject to the ineligibility bar. So a couple responses to that, Your Honor. First, on the asylum point, there's affirmative asylum point, there's nobody in this case who has standing to litigate that. But it wouldn't be a different case. I mean, it would still be the same challenge. Well, here I think I refer the Court to, this is in our papers, the Seventh Circuit's decision in 2018. So it's true that an individual who has an affirmative claim for asylum initially doesn't go before the immigration courts. But if that claim is denied, they then go before the immigration courts, because the regulation provides that they are then subject to removal and they're issued a notice to appear. And in DeKalb, the Court said, well, look, because that option remains available, that's where the claim has to be litigated. And it may be that the government doesn't ever place the individual in removal proceedings. That's a separate issue. That's not this case. And the it's not jurisdictional at that point. It's a non-final agency decision, interlocutory in nature, that then can be adjudicated finally in the removal proceeding. So if we had a case that involved somebody who sought affirmative asylum, and who wasn't subject to removal proceedings, and we don't know whether there would be a removal proceeding at the end of the day, because as you say, it's up to the government to decide whether to initiate one. Maybe they're even subject to DACA, and it hasn't been validly rescinded at the time. But let's just suppose you have one, would you still say that B-9 poses a bar? So a couple of responses to that too, although this wasn't, we didn't brief this in our briefs, but to answer your question. So first, we're not arguing B-9 in that context. In the affirmative asylum case, we would be arguing finality and ripeness sort of issues. We would be arguing, and that's what the Seventh Circuit relied on, that the individual can still litigate this affirmative asylum claim, or challenge the denial of it, I should say, including challenges to the rule on which that denial was based in the removal proceeding. But I do think there's a line of cases, it's not briefed here, that provides that if there's no way to get into a removal proceeding, then you don't have a, then you do have final agency action, and in that potential situation, you might have a claim in district court, but none of the individual plaintiffs fit that situation here. And so it was, it was, there's a disconnect between the district court's reliance on the possibility that an individual may have an affirmative asylum claim, and it's conclusion that then that means these individuals who are all indisputably in removal proceedings at the time the court issues its decision, they also don't have to raise their claims. Where are the removal proceedings now? Is it, is everything on hold because of the Ninth Circuit? No, Your Honor. My understanding, so the rule just was enjoined, and that was affirmed in the Ninth Circuit. So that means this particular rule cannot be applied, so long as that injunction's in place, to these particular individuals, or anyone for that matter, in removal proceedings. But the proceedings are ongoing, so a number of individuals have been granted asylum, their claims are moot at this point, they have no real reason to challenge the rule anymore, and then the majority of the plaintiffs are still in removal proceedings, and they remain ongoing. They've all, does, I'm not really clear about this, but in these removal proceedings, has the issue whether these particular individuals are eligible for asylum, has that come up? It has. They've all raised, many of them have raised defensive asylum claims as a defense to removal, but since the rule has been enjoined by the Ninth Circuit, or that injunction has been affirmed by the Ninth Circuit nationwide, this rule cannot be applied to them. However, I don't think- Yeah, in other words, they're eligible. They're not ineligible because the rule has been enjoined. What I'm getting at is, it's the immigration judges who make these decisions? Is that right? Initially, the immigration judge, and then depending on what happens, it's appealed to the board, and then- So, with respect to all the plaintiffs, other than the ones who've already gotten asylum, has there been any judgment by the immigration judges about whether they qualify for asylum? Yes, Your Honor. So, not based on the rule, but three, as of our reply brief, three individuals had been found to warrant the grant of asylum and had received asylum. What about the others? What about the others? What about the others? So far as I'm aware, they have not yet been granted asylum. It may have been denied on other grounds, and the proceedings are still ongoing on that basis. So, they would take an appeal up to the Board of Immigration Appeals, and then if they're unsatisfied with the result there, they go up to the relevant Court of Appeals. But I think on that point, even though they're not necessarily directly challenging the rule right now in their proceedings, I think the teachings of the cases that we cite in our brief and the lesson here is, they can raise that in the Court of Appeals because they're litigating their asylum claims. This would be relevant to their asylum claims. So, if ever the rule is operative again, they can raise in the first instance to the Court of Appeals a challenge on the merits, on the legality of the rule, even if the immigration judge or the board cannot set it aside on their own. So, is this actually an exhaustion case? Yes, Your Honor, that's the government's position. Because they are in removal proceedings now, they have to raise all their claims relevant to their removal in those proceedings. And there's a statute, Section 1252D. Are you familiar with our decision in a case called Avocados Plus? I apologize. I don't believe I am. Where we analyzed judge-made and the other is jurisdictional. And is 12, what is it, 1252 or 92, is that jurisdictional or judge, is exhaustion judge-made or jurisdictional? So, that's jurisdictional by statute. It's a mandatory exhaustion provision. We cite a number of cases from other circuits addressing that. I don't think this court has had the opportunity to specifically address 1252D. These cases are rare in this jurisdiction. But it's mandatory. It's a mandatory exhaustion requirement. So, 1252B9 plus D channel everything up on appeal. And if you don't raise the claim in that proceeding, you cannot raise it in the petition for review. We do cite a case. Isn't there a provision in 1252 that actually talks about exhaustion? Yes, Your Honor. That's 1252D. 1252D says you must raise your claims first in the proceeding and then following that on the Court of Appeals. So, there's no, any way you look at it, you don't get into district court, particularly as an individual challenging your asylum determination. I am running short on time. I do want to touch briefly on a couple of other issues unless there are other questions on jurisdiction, on this particular. I have one quick one and we'll let you touch on the other issues too. Thank you, Your Honor. For the individuals who've been granted asylum, if you win ultimately at the end of the day on the merits, then are they at risk? I think that depends at what stage their proceedings are in. If their proceedings are over and done, I think they're fine. If their proceedings are ongoing, so if they, no decision has been rendered yet on their case, then I think under general retroactivity rules, this rule can be applied to them in their proceedings because the proceedings are not final. But if the proceedings are final, I think they're fine. That's my understanding of how those cases work. I was thinking of 1252 D, which says a court may review a final order of removal only if the alien has exhausted all administrative remedies, right? Yes, Judge Randolph, that's the provision I was referring to. I thought you said B. Okay. B9 zips up in the related to that proceeding into that one petition for review. And unless and until you go through that process, you don't have any forum in federal court. So if in these removal proceedings, there's final orders of removal and the aliens did not raise the defense of asylum, then they wouldn't be entitled to raise it in court. Is that right? I think that's right, Your Honor. But I think every single one of these individuals, the name plaintiffs in the case are raising asylum claims. So this is not a situation where they're going to be blindsided by a ruling saying you should have done that. They've all raised asylum. No, it wasn't. What I'm getting at is it wasn't optional. They had to raise it in the removal proceedings, so they would lose it in response to read judicial review of the of a order removing them, right? Yes, Your Honor, that's correct. So any any removal related issue, including relief from us from removal, which asylum is would have to be raised first in those proceedings for these individuals. And even without the jurisdictional exhaustion requirement, I mean, it's just odd to be in this posture where a district court is litigating parties are litigating in district court, while the individuals are also in removal proceedings at the same time. That's precisely what the Congress sought to eliminate in 1996 and 2005 with the section 1252 revisions on claim channeling. I am over time. I do. I have another question. I have another question. If if an individual let's suppose that the rule is upheld and the proclamation, whatever it is at the moment, is in force and an individual crosses the border and is therefore not at a point of entry, but is therefore declared ineligible for asylum. Does the attorney general or the secretary nevertheless have discretion to allow that individual to remain in the United States? Not based on asylum, not on the finding of asylum, but the rule does not eliminate other forms of protection and inconsistent with international treaty obligations that the I'm wondering if there's any function that is served by number one, having giving an alien the right to apply for asylum. And then number two, because of the operation of the rule and the proclamation making the alien ineligible is the application for asylum. Does that serve any function? Yes, I think it does. A couple of things here. First, this isn't just anyone who crosses the border. This is if there's a proclamation in place and the proclamation, as we lay out in the brief in more detail, spoke to a specific point in time when there was a just a massive individuals crossing the southern border. The president and the administration thought there was an immigration crisis. And that's what this was responding to. Of course, those are facts from 2018 at this point. Two years ago. But the application itself, an individual doesn't just apply for asylum when they seek protection from removal. They apply for asylum withholding relief under the Convention Against Torture. So those three types of relief. And so even if they're ineligible for asylum, they're still applying for withholding of removal and for cap protection. And it's my understanding that most, if not all of the individuals in this case are seeking such relief as well. But as to if your honor is asking, what's the point of applying for asylum if you're eligible for it? I think that's sort of the dispute within the panel in the Ninth Circuit in the East Bay case that you apply just because you are ineligible for asylum does not mean you're ineligible for those other forms of relief. But but also the statute itself is structured that way. Many people are entitled to apply for asylum, including the six categories of individuals under 1158 B2, for example. Is that the particular felons? You're talking about felons, terrorists, political crimes. They can all a lot of other categories. They all can apply, but they know with a certainty that they're not going to be granted asylum because the Congress has taken away the discretion of the attorney general to grant asylum in those circumstances. And this is what the rule does here as well. In a much more narrow and cabin specific point in time, 2018, November, where there is a record showing a uptick, a large uptick of illegal crossings at the southern border. What seems different about this is it's of course it's true that there can be people who are ineligible even if they're allowed to apply. That is true of any dynamic that works this way. But what seems different about this is that the statute that spells out who applies specifically designates one consideration as not diminishing the ability to apply. And that's if you enter at a designated port of arrival or if you've been interdicted in United States waters, it specifically says that those individuals can apply regardless of that fact. And then when the categorical rule of exclusion relates only to that fact, that's what makes this dynamic different than the other examples that you're identifying. So I take the point, and I understand the question, but I think we respectfully disagree with that. I think it's instructive to look back at what preceded this statute in 1996, the asylum statute in the Refugee Act in 1980 was similar. It provided that individuals may apply for asylum irrespective of their status. And then the board in 1987 in the case matter of Pula addresses what that really means. And what that means is you can apply for asylum regardless of whether you cross at a port of entry or illegally between ports of entry, or if the United States brings you here against your will or interdicts you on the high seas. But none of that means you're can apply. And I think the other thing is, if you look at what Pula was doing, Pula responded or pulled back, I should say, a decision matter of Saleem from 1982, which did provide for at least five years until Pula that matter of entry can be an outcome dispositive factor in an asylum determination. And that was five years and that statute allowed for it then. So the statute has the board reading it two different ways. And I don't think the 1996 amendments changed that in fundamental way. What did 1996 act says is, okay, port of entry, not port of entry, either way you can apply, but that doesn't promise you anything other than potentially ultimate denial. And so the district court acknowledged that the government could do this case by case. It went so far as to acknowledge Pula allowing for that, but then it just says you can't make that a categorical denial. And I think the trouble with that from the government's perspective is the anything about it has to be case by case or not. There's nothing in the statute explicitly that says every asylum case must be adjudicated case by case in the specific facts of that case. Suppose there's a rule that says nobody who applies for asylum is eligible for asylum for five years. Would you say, well, you know, yes, you got to apply. And yes, the statute allows people to apply for asylum. And the fact that nobody gets it, that's whether you're going to get it ultimately. It doesn't have to do with whether you can apply for it. So let me quibble with the premise of the question just a little bit. Because we do have a provision 1158 A2B in the application section of the statute that says you have to apply within one year. And we have another provision A2C, which says if you've you cannot apply for asylum again. And then there's an exception for changed circumstances. But the statute does allow for that. So I think the question in your hypothetical would be, is a rule like that that says, OK, you can't apply for another five years. Is that consistent with the statute? And arguably it would be because 1158 A2C says if you've already applied and been denied once, you've lost your shot and you don't get to apply again. Well, I'm talking about first time applicants, too. I'm not talking about somebody who already applied. I'm just saying it's if we just cut off eligibility at all and just say across the board, nobody's eligible for asylum. I mean, in theory, one could say, well, you still get to apply. It's just that and the statute does allow people to apply for asylum. But the statute doesn't say that anybody who applies actually can get asylum. So we're just going to cut off eligibility for asylum. The argument would be and there would be some metaphysical distinction between whether you were eligible to apply and whether you were eligible to receive. But the statute presupposes that people can apply for asylum. And one category that specifically can apply is people who arrive outside of a port of entry. That's a threat, Your Honor. They can apply. But again, I go back to the statute and the discussion I just had with Judge Randolph. There are six categories that are all individuals who can apply. All those terrorists, particularly serious crimes, those bars, they can all apply, but they're categorically barred at the outset, but they can still apply. And there's a reason for them to do that. They can seek other forms of release, like withholding or can't release. And also, I don't know that it's the statute is as crystal clear as the district court thought on this matter of entry application versus eligibility. There's another provision, 8 U.S.C. 1231 A5, which provides that if you illegally if you cross the border between ports of entry, so illegal reentry after having been removed, you are categorically barred from asylum. So it's not clear to me that Congress specifically said anyone, regardless of how they cross the border illegally, shall be eligible for asylum. And we're conflating eligibility and application here for purposes of your question, Your Honor. But Congress, in fact, said the opposite in that provision. It said cross the border illegally, you are excluded from asylum. So the statute doesn't seem to be unambiguous on that point. And it if there's a provision that provides the government authority to render classes of aliens categorically ineligible for asylum, 1158 B2C, unless there's something explicit in the statute that says manner of entry cannot be a basis for ineligibility, then I don't see the inconsistency. And we know manner of entry is not a basis, cannot be a basis for ineligibility because Congress is legislating against the backdrop of 30 years of administrative law in these cases. And we have a matter of Pula, which says, weigh it this way. And we have a matter of Selim saying no way as an outcome determinative point. But in both cases, it's a relevant criteria. Can I ask one question based on one thing you said? You said the statute is not unambiguous. And I noticed that the government didn't ask for Chevron deference, which if you thought the statute was unambiguous, but was not unambiguous, then Chevron could potentially get you somewhere. And the Ninth Circuit did extend Chevron deference. And I'm just wondering, does the government think that the Ninth Circuit was wrong to do that? Or does the government have a view on that? So you're right, we didn't explicitly ask for Chevron deference in our briefing. So I can't stand here before you sit here before you today and say, actually, we want Chevron deference. I don't think we can waive it under this court's precedence. I think that's not something that the government, the DOJ, the Department of Justice can do. If Congress, if it's unambiguous, it's unambiguous. If it is ambiguous, it is ambiguous. All I meant to say is the statute, I think our point, our lead point is the statute doesn't explicitly say a matter of entry can never be a bar to eligibility for asylum. And I think we don't need deference to win on that point. But I don't think we can waive the deference argument if Chevron does apply. I have a couple more questions. First of all, is eligibility for asylum a defense to a criminal prosecution for illegal entry? It is not. It's not. Is it accurate that the initial entry by an alien from other than a port of entry is a misdemeanor punishable by six months in prison? You can be charged for that for your first entry. And if the same alien tries to enter again after being removed, it becomes a felony. Is that true? That's correct. That's correct, your honor. Okay. If you take this scheme, the rule plus the proclamation and apply it to the second category of illegal entry, the felony category, because it's two years imprisonment, then there's, I don't think there's any argument that that would be invalid. No, I would agree. Okay. Are you familiar with the Supreme Court's opinion in Reno versus Flores? The 1993 case, your honor. Yeah. It was an immigration case by Justice Scalia. And he held for the court unanimously the following that when a statute is, or when a regulation is claimed to be in violation of a statute, that the Salerno rule applies. You know what the Salerno rule is? Yes, your honor. I think I know where you're going. Okay. Which means that argument, which means that with respect to the two time offenders, that if that is a valid application of this regulation to those people, then the regulation, because it's only a facial attack, not as applied. And the petitioners, the plaintiffs say that over and over again, that means that the regulation, we have to uphold that regulation. I would agree with that, Judge Randolph. I would admit we did advance that argument in our briefing, but let me take it in a slightly different direction. An argument we did advance in our briefing. That is exactly why these claims are channeled into petitions for review raised by individual aliens in those proceedings. It could be that the rule is not facially invalid, but as applied to an individual in a particular context in this particular place in time, maybe invalid on the facts of those cases. But here I think it's instructive. Plaintiffs don't advance a due process argument. They don't advance an equal argument. And I take the point, and I think I would certainly agree with it, because they raised that as a facial challenge here, that because it can be applied lawfully to a large number of individuals, it can't be facially invalid. And so that again, just proves the reason why this has to be channeled through the petition for review process, because there could be an individual who does have a viable or colorable due process or other constitutional claim. And that claim is preserved and can be raised in the petition for review process. I do, I see I'm way over, so I'm happy to stop whenever. But I do have one other point I did want to make on the statute, and it goes to the zone of interest point, I think, because- Go ahead and make that point, and then we'll hit it from the other side. Because even recognizing that even if the individual's claims are channeled, they're still the organizations. We lay out in our briefing why we don't think they have standing, but putting aside the standing point, just the zone of interest point I think is an but it's not a toothless test. And I think what the district court did here, it relied on 1158 D4. And plaintiffs repeat this argument on appeal and D4 provides that organizations or the attorney general has an obligation to inform individuals in proceedings seeking asylum that they may be represented by counsel and to refer them to organizations whose job it is to, or mission is to represent these individuals in proceedings. And that provision cannot, I think, show that Congress intended to protect the interests of organizations to represent third party aliens, because there is a provision D7 later in the statute that specifically says that nothing in this subsection shall be construed to create any substantive or procedural right or benefit legally enforceable by any party against the United States. So even if we get past the jurisdictional and standing points, I think the statute pretty clearly shows Congress did not have an intent to provide a protectable interest under this statute to organizations. So one final question on that. If the individuals get past the, and you'll resist the premise, but just bear with me. If the individuals get past the jurisdictional bars that you've asserted, and they have standing, and you don't contest the individual standing, and they fall within the zone of interest, does it matter if the organizations don't? No, I don't think it does. I think this court's case is that I'm just relying on this court's cases. If you have one party with statutory jurisdiction and standing, then I think that's under this court's cases enough. Okay. Thank you, Mr. Reveni. If my colleagues don't have further questions for you at this time, we'll give you some time for rebuttal. We'll hear from Appalachian Council, Ms. Zaharia. Good morning, and may it please the court, Amy Zaharia of Williams & Connolly for the OA plaintiffs. With the court's leave, plaintiffs have divided argument time today. I'll address the issues related to statutory jurisdiction with respect to the individuals. Mr. Reich on behalf of the SMSR plaintiffs will address the organization specific issues, and then the merits. Plaintiffs' claims here are quintessential APA claims arising from agency rulemaking that are within the court's federal question jurisdiction. The government's argument that section 1252B9 strips the court of jurisdiction over these claims is wrong for the simple reason that the claims do not arise from removal proceedings. And in the alternative, if the court were to conclude that the claims do arise from removal proceedings, at least some of the plaintiffs, they arose from expedited removal proceedings, and the court would have jurisdiction under subsection E3. Now, let me start, if I may, with section 1252B9. I heard the government describe section 1252 as a comprehensive review scheme. In fact, that's not the way the Supreme Court has described section 1252B9. In the most recent DACA decision, the court described this as a targeted narrow provision, and it is part of a provision, section 1252, that both the Supreme Court and this court consistently have read against the backdrop of the presumption in favor of judicial review. We know from the Jennings plurality opinion, which I think the court in DACA largely adopted, that the relevant question under section 1252B9 is whether the legal question presented by the case arises from an action taken to remove an individual or from a removal proceeding. And the focus is on the legal question, just as Alito emphasized that in footnote three of his opinion. The legal questions here arise from agency rulemaking that renders a class of individuals categorically ineligible for asylum, no matter how they apply, whether they apply affirmatively outside removal proceedings or whether they apply defensively within removal proceedings. And plaintiff's claims here existed before and independent of their removal proceedings. Their claims existed once they crossed the border with the intent to apply for asylum and were subject to a rule that rendered them categorically ineligible to obtain asylum. The government focuses on the fact that none of the plaintiffs in this case applied affirmatively, and that is for the simple reason that they were apprehended before they had the opportunity to do so. But the fact that that apprehension forced them to raise their claims defensively changes nothing about the legal nature of those claims. The legal claims are the same for our plaintiffs and for individuals who would have applied affirmatively for asylum after crossing the border, and that is something that happens with some frequency. If someone is not apprehended and enters the country outside a port of entry, their mechanism to obtain asylum is to apply affirmatively. So can you address the argument that was made that if you have an affirmative application for asylum where the person is not yet in removal proceedings, that there's either an exhaustion or ripeness problem with that? Sure. So if someone is not in removal proceedings and applies affirmatively for asylum, what happens when asylum is denied depends on their status. So if they are here unlawfully, then they would then likely be referred to immigration court where they could then re-raise the asylum claim. If they are here lawfully, then I agree with Mr. Uveni that there is not normally a mechanism for them to seek review of their individual determination because there's no final agency action. But I think that just illustrates why the government's position here cannot be correct because a plaintiff in that situation would have no mechanism to bring an APA claim challenging the validity of agency rulemaking. Again, a quintessential APA claim that would render that person ineligible, categorically ineligible for asylum. And there would be no mechanism for them to bring that claim, which is exactly the kind of circumstance that courts have looked to, for instance, in Jennings and McNary to conclude that this is not the kind of claim that Congress intended to channel through section 1252b9. On the other hand, your claim is a facial challenge. So that's a subset of the individuals who are affected by the rule. But what about all the others? And what about the felons? What about all the other various people who are excludable? Well, I guess I'm not understanding the question as it relates to felons. Those people were already ineligible for asylum. But the claim here, it is a facial claim. But they can apply. They can apply for asylum, correct? They can apply for asylum. I think that as judged by the explain in the Ninth Circuit proceedings, the distinction between applying for asylum and eligibility for asylum is really a hollow distinction. And if I may, I'd like to refer the merits questions to Mr. Rice, who is prepared to explain what the gist of this is. And I think that there's a lot of implications that the decision that we're making here is not a there was a decision that was made in a statutory jurisdiction. These people, all of these plaintiffs were categorically ineligible for asylum and otherwise would have been eligible. None of the plaintiffs are felons, for instance. And so this is a facial challenge to the rule brought under the APA. And again, it's a rule that would affect them whether or not they were ever in removal proceedings. And I think that's why this case is very much like the DACA decision that Judge DACA status could be a defense to removal. In that case, the government argued that its rescission of DACA was the first step taken to remove these individuals. And so even though that issue perhaps might be adjudicated in some future removal proceeding, whether the rescission of DACA was lawful, the court nonetheless had no trouble holding that it did not fall within Section 1252B9. You don't dispute the proposition that the claim that's being asserted here by your clients could be asserted in a removal proceeding. Your point is that even if it could be, it doesn't have to be. Exactly. I do think it would be quite difficult to assert this claim in a removal proceeding for two reasons. First of all, individual immigration judges don't themselves have authority to rule that agency rulemaking is invalid and contravention of the INA or not promulgated pursuant to notice and comment rulemaking. So I do think there's a question about whether these claims could even be adjudicated within the agency. That is not an argument against jurisdictional exhaustion. And that's the case I mentioned to counsel for the if the agency or whatever body within the agency has no authority to declare something unconstitutional or illegal, whatever, you still have to raise it. Well, it is one of the factors that courts look to under the Thunder Basin test. Now, it's not, which we don't think applies here, but it's not a dispositive factor, of course. I think the other relevant issue is Section 1252B4, which is part of the same statute and Section 1252B4 limits a court of appeals on a petition for review to the record of the individual removal proceeding, which in an ordinary case would not include the record of agency rulemaking. Now, of course, there are procedures that require the government to come forward with that record in APA claims in federal court, but the government has cited no requirement that would require the government to come forward with that record in individual immigration proceedings. The most it has offered is that these individual asylum applicants, the thousands of them, many of whom are pro se, could somehow agree with the government in the course of these immigration proceedings to get that record, to put it before the IJ as a so that it would be preserved for a court of appeals on a petition for review. And I think the fact that Congress included that in Section 1252B4 is a very good indication that Congress did not intend for these kinds of classic APA claims to be adjudicated on a petition for review. I see I'm out of time. If the court has further questions, I'm happy to take them. Otherwise, I will pass the virtual podium on to Mr. Reich. Thank you. Unless my colleagues have other questions, doesn't sound like they do. Thank you, counsel. We'll hear from Mr. Reich. Good morning, Your Honor, and may it please the court. I'm Mitchell Reich for the SMSR plaintiffs. Ms. Sahari was just discussing the reasons why we believe that the individual plaintiffs have properly invoked this court's jurisdiction. And before turning to the merits, I want to briefly discuss a separate and independent avenue for this court to review the plaintiff's claims. There are two organizational plaintiffs before this court, Raices and Kerr Coalition, that have submitted detailed and uncontested declarations explaining that the challenge rule will frustrate their ability to carry out their mission and require them to divert substantial resources in order to counteract that harm. Can I just ask you the same question I asked Mr. Rivani, which is if if the individuals do have standing and are within the zone of interest and the jurisdictional bars don't preclude them from going forward. And I know the government disputes that, but I just want to just engage on the premise. If that's true, then does any of the points you're making about the organizations matter? No, these are two separate and completely independent avenues for this court to exercise jurisdiction. As Judge Moss recognized, if you found we were correct on either one, you could reach the merits of the claim and the relief that the court would award would be exactly the same. And I want to discuss the organizations briefly because I think that the government's, even if the court thought that the government's jurisdictional arguments had some merit with respect to the individuals, which all the reasons Ms. Zaharia laid out, we don't think they do. We don't think they have any merit with respect to the organizations. Judge Moss concluded that below. Judge Kelly concluded that in the closely related care coalition case. And indeed in the district court, as noted in footnote six of the district court's opinion, the government didn't even argue the organizations were subject to the jurisdiction channeling scheme. And I think it's pretty obvious why that scheme, as the Supreme Court said in INS v. St. Cyr is designed to proceedings for review on an appeal from a final removal order that it's not a scheme to strip jurisdiction over any claims that arise outside removal. And I think Mr. Rivini in a sense gave the game away when he acknowledged that this scheme would not preclude an individual alien from asserting a challenge to this rule. If they pressed an affirmative asylum claim, he suggested there might be other finality and ripeness problems, but he acknowledged this jurisdiction channeling scheme wouldn't apply to that claim. And I think that's an acknowledgement. This is not a comprehensive scheme for reviewing certain legal questions. It's just a scheme for reviewing questions that arise in removal. So organizations whose claims don't even plausibly arise within the removal process. After all, these organizations aren't themselves subject to removal and their claims would exist even if no removal proceedings were ever brought. I think that demonstrates that their claims can't be precluded. And also note that Mr. Rivini said that there was no one before the court who could possibly assert the interests of persons filing affirmative asylum applications. That's not correct. RAICES in paragraph 29 of its declaration explains that it represents at least 100 applicants a year filing affirmative asylum applications. And all the harms identified in RAICES and CARE Coalition's declarations that give them standing and place them within the zone of interest apply as to those individuals. This rule makes it substantially more difficult to counsel those individuals, to represent them in asylum proceedings. It would be more time consuming to represent them. They'd have to represent the children separately because they couldn't be derivative beneficiaries of their parents. And so even if no removal proceedings were ever brought against these organization's clients, they would still have these claims because they would still be harmed by the rule. And that is sufficient to conclude they're outside the jurisdiction channeling scheme. I'd also like to notice the zone of interest. Mr. Rivini suggested that these organizations don't what he referred to as a cause of action under 1252. I think that's just a conceptual error. These organizations have a cause of action under the APA. They don't need to find a separate one under 1252. The only thing they need, or under 1158, all they need to show is that they're within the statutory zone of interest. And that permissive test, as Judge Moss explained, is easily satisfied here. The interests the organizations are asserting is the very interests the asylum laws protect. That is, helping people file meritorious claims for asylum. They don't need to show that they themselves are the intended beneficiaries of the statute. That's the teaching of the Supreme Court's cases in Patchak and NCUA, and of many of this court's cases. And they don't need to show that Congress contemplated suits by these particular organizations. I think the fact, though, that Congress in 1158d4 specifically pointed to organizations like these and made sure that asylum applicants could be represented by them just shows that the interests of the organizations are aligned with those of the asylum seekers, and that's vaults them far beyond the threshold to fall within the zone of interest. Turning to the merits, this whole jurisdictional discussion, as the district court said, is a very long backstroke for a very short putt. The text of section 1158a1 provides that any If that's the case, if the backstroke is too long for the short putt, the putt will be missed. I think Judge Walsh's point is... District court missed the putt, of course, yeah. I think he got the putt just right. I think it's a clear shot from the statutory text to the result, which is that section 1158a1 says that any alien who enters the United States, whether or not a designated port of arrival, and irrespective of their status, may apply for asylum. This rule says that an alien who enters the United States outside a designated port of arrival is ineligible for asylum. I think, Judge Randolph, your question hit on the central flaw in this rule, is that it would deprive the rights to apply for asylum, irrespective of status, in 1158a, functionally meaningless. It would essentially write it out of the statute, and under 1158b, to see... Why? Why is it write it out of the statute? All the people that are coming through ports of entry are still eligible, and they can apply. There are all kinds of barriers. There's, where people are declared ineligible, aliens declared ineligible for a whole variety of reasons, and have been for a couple hundred years. See the Supreme Court's opinion in and those people, you can say, well, it's read out of the statute. They all can apply. Huge subsets of them are ineligible. Yes, Your Honor, and our argument is not that the rights to apply guarantees eligibility. It's that the right to apply, irrespective of status, and whether or not you entered at a point of entry, guarantees that you won't have an application denied on that exact characteristic. Terrorists, criminals, as judged by the observed, there's no rights to apply irrespective of whether you're a terrorist or a criminal. So there's no conflict between the statutory rights and the eligibility bars for them, but there is a right to apply whether or not you entered at a port of entry. Let me put the direct question to you. Take my hypothetical where an individual is swimming the Rio Grande for the second time and gets caught, and that person has committed under the statute, what is it, 1385, I forgot, has committed a felony. And what's the argument why that person is entitled to eligibility for asylum? That person might not be entitled to eligibility, but this rule, this rule of decision, as Judge Bybee put it, would still be unlawful as to them, because the characteristic that would be rendering them ineligible under this rule is their unlawful entry, entry outside a port of and that might be totally lawful. I'd also note that... But the felony is the entry beyond, in a place other than a port of entry. That's the felony. Person's totally clean otherwise. Two points, Your Honor. First of all, I don't think it's true that any alien who commits a felony is automatically ineligible for asylum. I think the provision you're pointing to is the one saying that someone who commits a serious crime is ineligible for asylum, and that's often a case-by-case determination. It wouldn't necessarily be the case that unlawful entry even second time would render someone ineligible for asylum on that basis. But even if it did, the government could remove them because they committed a crime. It cannot remove... Excuse me. Could deny them eligibility because they committed a crime. Every person that enters the country in a place other than a port of entry is committing a crime. Every single one. Yes, Your Honor. But that may be the case, but still the protection in Section 1150A1 is that that alone, that unlawful entry alone, cannot be the basis for categorically rendering someone unable to seek asylum. That's the protection Congress put in. And indeed, much of the asylum system is built around the premise that people who are here illegally can still seek relief from removal. That's what asylum is there for. That's what the expedited removal scheme, the entire credible fear screening process is for. The persons who recently entered unlawfully can still assert protection from removal on the basis of asylum. So they can get asylum, but they have to serve six months in prison before they can get out. Is that right? That may be true. And I think that just shows that there's a lot of tools in the government's toolkit here. If it wants to deter unlawful entry, if it wants to penalize these persons, it can also try to enter a third country agreement with the countries these aliens came from. There's a lot of powers in the asylum laws. But one power that there is not is that 1158B2C says that any bar on eligibility must be consistent with this section. That is consistent with 1158 as a whole. And that includes the very first protection of the statute, the rights to apply, irrespective of manner of entry. What is the status of the proclamation now? The proclamation, the most recent proclamation provided that it would remain in force until 90 days after the Ninth Circuit's injunction was lifted. So it still remains in effect. And I actually think that highlights a separate legal flaw with this scheme that the government has come up with. What determines whether aliens are subject to this eligibility bar is whether the president decides they will be. He determines whether there is a proclamation that triggers this rule, how long that proclamation lasts. The rule says he can make exceptions to it for persons who are eligible for asylum. And well, that leads me to my next question. And this is a pure hypothetical. Let's suppose that the Biden administration, if it becomes an administration, the first day, January 20th, repeals or whatever the proclamation, does that move this case? Why not? Your Honor, we think it would be entirely appropriate for the courts to hold this case pending the inauguration to see what happens. I think we would need to see the content of the proclamation to determine whether it truly moots the case, whether there's no chance of any legal relief to run on exactly what he said. The rule itself might be hanging out there. I think we would want to see what it says and submit filings to that effect and discuss what the result was. But we think that's fair enough. And so it's possible that a new incoming administration could move the case. It's entirely possible. And I think the Biden administration, to my knowledge, has indicated they are planning to withdraw many of the current administration's asylum policies. So I think there's a good chance that will happen. And in interest of judicial efficiency, it might be appropriate to wait. Can I ask a question about the merits? So unless Judge Randolph has a follow-up question on that along those lines. On the merits, if the statute said, 1158A1, that instead of irrespective of such alien status, it said irrespective of such alien status, including whether they have been convicted of, I'm looking for the exact word, a particularly serious crime, and then the statute still had B2A Romanet II about a particularly serious crime, would you just say, well, that statute's just completely internally inconsistent, it makes no sense, or would it still make sense because the first provision deals with application and the second provision deals with eligibility? It would make no sense. There's no delta after two years of litigation that the government can identify between a bar on applying and a bar on eligibility. There's no separate benefit conferred by the rights to apply other than the possibility of being eligible. And both bars, bars on applying and eligibility are applied at the same point in the process by the same officers and have the same result. And I would just note that this rule, the government sort of floated the possibility, bars on application are a screening tool, and bars on eligibility somehow come in at the back end. As I just noted, in practice, that's not true, they are applied simultaneously. But this rule actually provides that unlike every other bar on eligibility, asylum officers should apply this rule at the quote, threshold in the words of this rule, that is, when an alien asserts a fear of removal, in their credible fear screening interview, the very first question the government must ask, the asylum officer must ask is whether they're subject to this rule. And if they are, they have to have asylum denied. So even by the government's definition, this rule functions as a screening tool as a bar, it walks and cracks like a bar on applying for asylum. So even if there was some non existent functional distinction, I think this falls on the wrong side of that line. Okay, thank you. Let me see if my colleagues have any further questions for you, Mr. Reich. No. Thank you, Mr. Reich. Mr. Rivani will give you three minutes for your rebuttal that you asked for. Thank you, Your Honor. I'll be brief. So just a couple points of rebuttal. First, Ms. Zaharia refers to the DACA case, Regents, and I think we've discussed this a little bit, but just to close the loop on it. The court there has one paragraph, I'm looking at the decision now, and it essentially adopts the standard from Jennings in the plurality there. And that case is just different than this case. DACA has nothing to do with whether someone is eligible for relief from removal. It's a policy that applies entirely prior to and antecedent any sort of removal proceeding. But she made the point that DACA could be asserted in a removal proceeding. Is that not true? Once you're in removal, you're not getting your DACA back. No, that's not correct. You could get relief from removal. And then many months or years later, you could apply for DACA again, if DACA still exists at that time. But once DACA is rescinded, you're not going into the immigration court and arguing you should give me DACA back. And I think that dovetails with a point that Mr. Rice just made. What is the point of making someone apply for asylum if they're just going to be denied? It's not correct that it's a null set. When you apply for asylum, you're eligible for work authorization. And then as you go through your removal proceedings, which take weeks or months or years, you have work authorization. So that's a specific benefit that connects to an application that even if you're ultimately ineligible for, you can get while your application is pending. Just real quickly on the record making point that Ms. Sahari raised. And this is something I think Judge Moss relied on as well. And I think it's wrong. The fact that the immigration judge can or cannot make a record is not really the dispositive point under these claim channeling cases. The dispositive point is, can the court of appeals get the record? And the court of appeals absolutely can. 1252A says that these proceedings are governed by the Hobbs Act. And then it specifically carves out 28 U.S.C. 2347C as something the court of appeals can't do. That is take new evidence. But then that leaves in place 2347B, which allows the court of appeals to send the case to the district court to get a record. Also, I mean, part of this is just self-inflicted. Plaintiffs don't want to go through the removal proceedings, but nothing stops them from asking the IJ to produce the record or require the government to produce the record in those proceedings. So the issue on the record is, I think, a red herring. The statute itself may provide, because I don't have in front of you, but I thought the language was the administrative record on which the order of removal is based. And if the alien has raised an asylum claim, including that the regulation is invalid, then one could say that the administrative record for the regulation is part of the administrative record on which the order of removal is based. So that's right. That's right, Judge Randolph. And just because plaintiffs choose not to ask to submit that record or require the government to submit it for the briefs, but it was cited in the Supreme Court, single justice, Justice O'Connor's decision that we do cite in our briefs. It's this court's decision in IJUDA 7F 3rd 246 at 250. And that is sort of like that case is after years of litigation involving IRCA and saw the issues in McNary and Catholic services, which we cite in our briefs. And essentially it has two key holdings on a scheme that was even less restrictive than this one. It said that individual aliens must raise their claims exclusively in the court of appeals. And then it separately said it follows then that an organizational plaintiff could not undermine the statutory scheme by suing to challenge INS policies or statutory interpretations that bear on an alien's right to legalization. End quote. So I think that case is directly on point to a number of the issues here. And if there are no further questions, thank you. Thank you, counsel. Thank you to all counsel this morning. We'll take this case under submission.
judges: Srinivasan, Henderson, Randolph